[Cite as *State v. Griffin*, 2025-Ohio-5360.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BROWN COUNTY


STATE OF OHIO,                                     :

    Appellee,                                    :          CASE NO. CA2025-03-004

    - vs -                                          :          <u>OPINION AND</u>
<u>JUDGMENT ENTRY</u>
                                                    :          12/1/2025

DONALD W. GRIFFIN,                          :

    Appellant.                                    :


CRIMINAL APPEAL FROM BROWN COUNTY MUNICIPAL COURT
Case No. CRB2400308


Zachary A. Corbin, Brown County Prosecuting Attorney, and Mary McMullen, Assistant Prosecuting Attorney, for appellee.

Suhre & Associates, LLC and Joseph B. Suhre IV, for appellant.


## **O P I N I O N**

**M. POWELL, J.**

{¶ 1} Appellant, Donald Griffin, appeals his conviction in the Brown County Municipal Court for aggravated menacing. For the following reasons, we affirm.

## I. Factual and Procedural Background

{¶ 2}   On May 2, 2024, at approximately 7:00 a.m., Griffin pulled into Tankers Gas Station in Brown County, Ohio, intending to purchase diesel fuel for his tractor. Griffin, who works as a plant service manager for the Adams County Regional Medical Center, was running late for work that morning. When Griffin arrived, another vehicle blocked the diesel pump. While waiting, Griffin observed Anthony Mitchell pull up, park at the adjacent pump, and enter the gas station without purchasing fuel.

{¶ 3}   As Mitchell walked back to his vehicle after dropping off his daughter, who worked at the gas station, Griffin expressed his frustration. Griffin asked Mitchell words to the effect of, "Did you really just go in to get food? You blocked the pump to go get food?" A verbal exchange followed. Griffin's exchange with Mitchell was not pleasant; Griffin later admitted he was frustrated that morning and running late.

{¶ 4}   What happened next is disputed. According to Mitchell, after the verbal altercation, he got into his vehicle and observed Griffin open his driver's door, reach in, and pull a gun from the door. Mitchell testified that Griffin then "turned towards me after he had reached in" and retrieved his gun. Mitchell explained, "It was almost as if to make sure I saw that he had pulled a gun. Because if he hadn't turned at all, I would have never seen the gun." Mitchell further testified that he both saw and heard Griffin "rack the gun" by pulling the slide back. When asked directly what he thought when he saw this, Mitchell stated, "When he pulled the slide back, I thought he was going to shoot me, to be honest."

{¶ 5}   Mitchell testified that he immediately feared for his safety and his daughter's safety. He moved his vehicle forward toward the front of the store, positioning himself between his daughter inside and Griffin. He yelled at Griffin, "Did you just pull a gun on me?" and called 911.

{¶ 6}   Griffin presented a markedly different account. According to Griffin, after the

verbal exchange, he attempted to purchase fuel but discovered that the credit card reader at the pump was not working. He started to walk inside to pay but realized he had left his firearm in his unlocked truck. Not wanting to leave the firearm unattended, Griffin returned to his vehicle, retrieved the weapon from the door, and secured it in his waistband. Griffin testified that he took deliberate steps to position himself between his truck and the gas pump, keeping his back to Mitchell, to prevent anyone from seeing the firearm. Griffin claimed that no one could have seen his gun and that his firearm was already loaded, rendering it unnecessary to rack the slide. Griffin stated that Mitchell must have simply guessed that he had a firearm based on his shoulder movements.

{¶ 7} Mitchell's 911 call was played in court and admitted into evidence. During the call, Mitchell can be heard saying, "I don't care who you are, you shouldn't brandish a gun because you don't like where somebody is parked. That's a threat on my life. I have to worry about getting shot because I am parked at a gas pump."

{¶ 8} Brown County Sheriff's Deputy Benjamin Graham responded to the call. By the time Deputy Graham arrived at the scene, both Griffin and Mitchell had departed. Deputy Graham subsequently spoke with Griffin by telephone on the same day. When questioned, Griffin's initial response was, "there's no proof." Griffin asked Deputy Graham whether he had watched camera footage from the gas station. When Deputy Graham indicated he had not yet done so, Griffin stated, "Well, you know, if there wasn't working cameras, there pretty much wasn't nothing [the police] could do." Griffin did not provide Deputy Graham with the explanation he would later offer at trial, instead stating he would have his attorney present before giving his side of the story. The gas station's cameras were not functioning at the time of the incident.

{¶ 9} Griffin was charged with one count of aggravated menacing in violation of R.C. 2903.21(A), a first-degree misdemeanor. A bench trial was held on January 2, 2025.

The State presented testimony from Mitchell and Deputy Graham. Griffin testified in his own defense and attempted to demonstrate for the court how he positioned the gun in his waistband while re-tucking his clothing.

{¶ 10} At the conclusion of the trial, the court took the matter under advisement. The trial court subsequently found Griffin guilty as charged. In its written decision, the court explicitly stated, "The Court is not persuaded by the Defendant's version of events. The Court finds the Victim to be credible."

{¶ 11} A sentencing hearing was held on February 5, 2025. The trial court sentenced Griffin to serve 90 days in jail, with all 90 days suspended. Griffin was placed on community control for a period of one year. As conditions of his community control, Griffin was ordered to complete 24 hours of community service, successfully complete anger management services, have no contact with the victim, and not own or possess a firearm during the term of community control.

{¶ 12} Griffin appealed.

## II. Analysis

{¶ 13} Griffin raises two assignments of error, which we address together as they challenge the evidentiary basis for his conviction. In his first assignment of error, Griffin contends that his conviction for aggravated menacing is not supported by sufficient evidence. In his second assignment of error, he argues that his conviction is against the manifest weight of the evidence. Both assignments turn on whether the State proved that Griffin knowingly caused Mitchell to believe that Griffin would cause him serious physical harm.

### A. Standards of Review

{¶ 14} We begin with the applicable standards of review, which, though related, serve distinct functions in our appellate analysis. "Whether the evidence presented at trial

is legally sufficient to sustain a verdict is a question of law." (Citation omitted.) *State v. Moore*, 2021-Ohio-1856, ¶ 12 (12th Dist.). "When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." (Citation omitted.) *State v. Tenbrook*, 2020-Ohio-5227, ¶ 9 (12th Dist.). The relevant inquiry is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. In conducting this review, we do not weigh the evidence or assess the credibility of witnesses. *See State v. Were*, 2008-Ohio-2762, ¶ 132. "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." (Citation omitted.) *State v. Richardson*, 2016-Ohio-8448, ¶ 13.

{¶ 15} A manifest weight challenge, on the other hand, questions whether the state has met its burden of persuasion. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52. A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 2012-Ohio-2372, ¶ 14 (12th Dist.). "When considering whether a judgment is against the manifest weight of the evidence in a bench trial, an appellate court will not reverse a conviction where the trial court could reasonably conclude from substantial evidence that the state has proven the offense beyond a reasonable doubt." *State v. Lowry*, 2020-Ohio-1554, ¶ 15 (12th Dist.), citing *State v. Eskridge*, 38 Ohio St.3d 56, 59 (1988). In conducting our review, we examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trial court "'clearly lost its way and created such a manifest miscarriage of justice that the conviction

must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). "The discretionary power to grant a new trial should be exercised only in exceptional cases where the evidence weighs heavily against the conviction." (Citation omitted.) *State v. Applegate*, 2014-Ohio-1697, ¶ 8 (12th Dist.).

**B. The Essential Elements of Aggravated Menacing**

{¶ 16} Griffin was convicted of aggravated menacing in violation of R.C. 2903.21(A), which provides that "[n]o person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family." This statute "criminalizes a person's [knowing] threat of violence that creates fear or causes apprehension of serious physical harm in another person." *State v. James*, 2024-Ohio-621, ¶ 50 (12th Dist.).

{¶ 17} The statute requires proof of two essential elements. First, the defendant must have acted "knowingly." Under R.C. 2901.22(B), "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." Second, the victim must have had "a subjective belief of serious physical harm from the offender." *James* at ¶ 47.

{¶ 18} A threat of physical harm may be implied through actions or conduct without a verbal threat. *State v. Pierce*, 2024-Ohio-5357, ¶ 12 (12th Dist.). The "key" is whether the defendant's conduct causes the victim to genuinely believe that he is facing physical harm to himself or to his immediate family. *In re Burbrink*, 2001-Ohio-8680, *2 (12th Dist.). "Evidence of a person's belief that an offender will cause serious physical harm can be proven with circumstantial evidence." (Citation omitted.) *James* at ¶ 47.

- 6 -

## C. Sufficiency of the Evidence: the Knowingly Element

{¶ 19} Griffin's central argument is that the State failed to prove he acted knowingly. He contends that he took deliberate steps to prevent anyone from seeing his firearm by positioning himself between his truck and a gas pump while keeping his back to Mitchell. According to Griffin, he was merely engaging in the lawful act of securing his firearm on his person, and he had no reason to believe that Mitchell would perceive this as threatening.

{¶ 20} The evidence, viewed in the light most favorable to the prosecution, established far more than the innocent act Griffin now claims. Mitchell testified that after their verbal altercation, he saw Griffin open his driver's door, reach in, and pull a gun from the door. Mitchell then both saw and heard Griffin rack the gun, pulling the slide back. Critically, Mitchell testified that Griffin "turned towards me after he had reached in" and retrieved his gun, explaining, "It was almost as if to make sure I saw that he had pulled a gun. Because if he hadn't turned at all, I would have never seen the gun."

{¶ 21} This testimony, if believed by the trier of fact, establishes that Griffin was aware his conduct would probably cause Mitchell to believe he would suffer serious physical harm. The act of retrieving a firearm from a vehicle and racking it following a heated confrontation is objectively threatening conduct. That Griffin turned toward Mitchell after retrieving the weapon amplifies this inference. A rational trier of fact could conclude that Griffin's decision to turn toward Mitchell with the gun, rather than simply securing it discreetly while turned away, demonstrates awareness that his conduct would probably cause Mitchell to fear serious harm.

{¶ 22} Griffin's testimony that he was merely securing his firearm and that his gun was already loaded, rendering racking unnecessary, presented a factual dispute for the trial court to resolve. Mitchell's testimony about seeing and hearing the gun being racked,

combined with his observation that Griffin turned toward him, provides sufficient evidence from which a rational trier of fact could find the knowingly element proved beyond a reasonable doubt.

{¶ 23} The context of the encounter further supports this conclusion. The incident occurred immediately following a verbal altercation in which Griffin, by his own admission, was frustrated and running late for work. This was not a case where Griffin was calmly going about his business when someone happened to misinterpret innocent conduct. Rather, tensions had already escalated through their exchange of words. A reasonable person retrieving a firearm in such circumstances would be aware that displaying the weapon, particularly after racking it, would probably cause the other party to believe serious physical harm might follow.

{¶ 24} Griffin's contention that he took steps to hide his actions is contradicted by the evidence the trial court credited. Mitchell testified that Griffin turned toward him. The trial court was entitled to credit this testimony and to reject Griffin's claim that he carefully concealed his actions. Moreover, even if Griffin attempted some concealment, the fact remains that Mitchell saw and heard what was occurring, and the trial court could reasonably infer that Griffin was aware his conduct would probably be perceived as threatening given the circumstances.

### D. Sufficiency of the Evidence: Mitchell's Subjective Belief

{¶ 25} Griffin also challenges whether the State proved that Mitchell actually believed Griffin would cause him serious physical harm. This challenge fares no better. Mitchell testified multiple times that he feared for his and his daughter's safety and believed Griffin was going to shoot him. When asked directly, Mitchell stated, "When he pulled the slide back, I thought he was going to shoot me, to be honest." Mitchell's 911 call, played in court and admitted into evidence, captured his contemporaneous

statements: "I don't care who you are, you shouldn't brandish a gun . . . . That's a threat on my life. I have to worry about getting shot because I am parked at a gas pump."

{¶ 26} Mitchell's actions corroborated his stated fear. He immediately moved his vehicle toward the front of the store, positioning himself between his daughter, who worked at the gas station, and Griffin. He called 911. These are not the actions of someone merely annoyed or upset. They are the actions of someone who genuinely believed he faced a threat of serious physical harm.

{¶ 27} Griffin attempts to undermine this evidence by noting that Mitchell described Griffin as "well put together" and not looking like "an aggressive type of person," and that Mitchell continued talking to Griffin rather than fleeing. These observations, however, do not negate Mitchell's clearly expressed fear. A person can simultaneously recognize that another person appears outwardly composed while still fearing what that person might do with a firearm following a confrontation. Mitchell's decision to continue engaging with Griffin, rather than immediately driving away, may reflect his concern for his daughter's safety, his attempt to defuse the situation, or simply his shock at what had occurred. None of these considerations undermine the substantial evidence of his subjective belief that he faced a threat of serious harm.

### E. Distinguishing Contrary Authority

{¶ 28} Griffin relies heavily on this court's decision in *State v. Fields*, 84 Ohio App.3d 423 (12th Dist. 1992), and the Sixth District's recent decision in *State v. Szafranski*, 2025-Ohio-1104 (6th Dist.). These cases, however, are readily distinguishable from the present matter.

{¶ 29} In *Fields*, an off-duty police officer ejected trespassers from property while holding a firearm. Although she initially waved the gun, she did not verbally threaten the trespassers or point the gun at them. *Id*. at 428. Significantly, one of the victims testified

that the defendant was "pretty nice" during the encounter. *Id*. This court found insufficient evidence to support an aggravated menacing conviction, concluding that the defendant's actions did not constitute a threat and that the state failed to prove the victims were threatened with serious physical harm. The *Fields* case involved a defendant who, despite possessing a firearm, conducted herself in a manner that conveyed she was not threatening harm. The victims' own characterization of her demeanor as "pretty nice" undermined any claim that they genuinely feared serious harm.

{¶ 30} The present case stands in stark contrast. Here, Mitchell testified that Griffin pulled a gun and racked it immediately following a heated verbal confrontation. Griffin did not interact pleasantly with Mitchell, as the defendant did with the trespassers in *Fields*. Rather, Griffin's conduct followed an exchange in which, by Griffin's own admission, he was frustrated. Mitchell did not describe Griffin's behavior as "pretty nice." Instead, he immediately feared for his life and his daughter's safety, moved his vehicle to a protective position, and called 911. The qualitative difference between the defendant's conduct in *Fields* and Griffin's conduct here is substantial.

{¶ 31} Similarly, *Szafranski* is distinguishable. In that case, the Sixth District reversed a menacing conviction because the victim testified he was "'upset,' 'mad,' and 'angry'" but never indicated he was scared, afraid, fearful, concerned for his safety, or thought the defendant would shoot him. *Szafranski*, 2025-Ohio-1104, ¶ 51. The victim in *Szafranski* did not mention fear or harm when speaking with police, did not appear afraid on body camera footage, and did not drive away from where the defendant was parked. *Id*. at ¶ 52. The Sixth District concluded the city presented "absolutely no evidence" that the victim subjectively believed the defendant was going to harm him. *Id*. at ¶ 51.

{¶ 32} Here, by contrast, Mitchell repeatedly testified he feared for his safety and his daughter's safety. He stated he thought Griffin was going to shoot him. His 911 call

contemporaneously expressed his belief that his life had been threatened. And he took immediate protective action by repositioning his vehicle and calling emergency services. This is not a case where the victim's statements and conduct suggested mere anger or upset, as in *Szafranski*. Mitchell's testimony and behavior provided ample evidence of his subjective belief in a threat of serious physical harm.

{¶ 33} Griffin's reliance on these cases ultimately founders on the facts. Both *Fields* and *Szafranski* involved evidence that, even when viewed favorably to the prosecution, failed to establish the essential elements of the offense. Here, the evidence amply supports both that Griffin knowingly caused Mitchell's belief and that Mitchell genuinely believed he faced a threat of serious harm.

### F. Manifest Weight of the Evidence

{¶ 34} Having concluded that sufficient evidence supports Griffin's conviction, we turn to whether the conviction is against the manifest weight of the evidence. Our review of the entire record convinces us that it is not. The trial court, sitting as factfinder, was in the best position to judge the credibility of the witnesses and the weight to be given to their testimony. *State v. Brand*, 2023-Ohio-557, ¶ 123 (12th Dist.). And "[w]e generally defer to the factfinder on matters of witness credibility." *Id*. at ¶ 125. The trial court explicitly found Mitchell credible and rejected Griffin's version of events. This credibility determination finds ample support in the record.

{¶ 35} Mitchell's testimony was internally consistent and corroborated by his contemporaneous actions and statements. His 911 call captured his immediate response to the incident, providing real-time verification of his fear. His decision to reposition his vehicle to protect his daughter demonstrated the sincerity of his concern. By contrast, Griffin's testimony that he carefully concealed his firearm while securing it on his person conflicted with Mitchell's testimony that Griffin turned toward him with the weapon. Griffin's

claim that he did not rack the gun because it was already loaded conflicted with Mitchell's testimony that he both saw and heard the gun being racked. These factual disputes presented classic credibility questions for the trial court to resolve.

{¶ 36} Moreover, Griffin's statements to law enforcement raised further questions about his credibility. When initially questioned by Deputy Graham, Griffin stated, "there's no proof," rather than providing the explanation he offered at trial. When Deputy Graham asked about camera footage, Griffin responded, "Well, you know, if there wasn't working cameras, there pretty much wasn't nothing [the police] could do." These statements suggest a consciousness of wrongdoing and a hope that the absence of video evidence would preclude prosecution, rather than the confident innocence one might expect from someone who had merely secured a firearm discreetly.

{¶ 37} When conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the testimony and evidence presented by the State. *State v. Nelson*, 2024-Ohio-5750, ¶ 23 (12th Dist.). The trial court did not clearly lose its way in crediting Mitchell's testimony and rejecting Griffin's alternative explanation. The evidence does not weigh heavily against the conviction. This is not one of those exceptional cases where a manifest miscarriage of justice requires reversal.

### III. Conclusion

{¶ 38} For all these reasons, we conclude that Griffin's conviction is supported by sufficient evidence and is not against the manifest weight of the evidence. The State proved beyond a reasonable doubt that Griffin knowingly caused Mitchell to believe that Griffin would cause him serious physical harm. The trial court's credibility determinations are entitled to deference, and those determinations find substantial support in the record. Griffin's first and second assignments of error are overruled.

{¶ 39}  The trial court's judgment is affirmed.

{¶ 40}  BYRNE, P.J., and PIPER, J., concur.

## J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Brown County Municipal Court for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Matthew R. Byrne, Presiding Judge

/s/ Robin N. Piper, Judge

/s/ Mike Powell, Judge